F. J. LEWIS and WM. H. LEWIS, Partners, Doing Business as F. J. LEWIS PETROLEUM COMPANY, Appellants, v. JAMES McMAHON & COMPANY, A Corporation, and FIDELITY NATIONAL BANK & TRUST COMPANY OF KANSAS CITY (Formerly FIDELITY TRUST COMPANY).

Division Two, April 9, 1925.

1. **BILLS OF LADING:** Notations on Check of Goods Shipped: Conversion by Drawee: Replevin: Damages. Bills of lading for twenty-five cars of oil were indorsed by the shipper, and, together with

the invoices for each car, sold to plaintiffs, who sold to a purchaser, at an agreed price, and he gave to plaintiffs his check for the amount, drawn on the defendant bank. The bills of lading, with a separate invoice for each car, were delivered by plaintiffs to said purchaser contemporaneously with the giving of the check, and on their delivery the purchaser delivered them to the issuing carrier, and took out interstate shipper's order bills of lading for the twenty-five cars, reconsigning them to a consignee in Ohio, and these new or substituted bills disclosed that they had been issued in exchange for the prior bills of lading. The check given by the purchaser to plaintiffs, being in the form of a voucher check and showing that it was given for the purchase price of the twenty-five cars of oil, the numbers and initials of the cars and the price of each car being listed on it, was deposited for collection by plaintiffs in a local bank, and was forwarded through the mails to the defendant bank, on which it was drawn, for payment, and upon its receipt three days after its date payment was refused. In the meantime, the new or substituted shipper's order bills of lading had been placed by said purchaser in defendant bank, and, on the refusal of the bank to pay the check, the plaintiffs demanded from the bank and said purchaser said bills, which they refused to deliver, and thereupon plaintiffs sued them in replevin, but after the commencement of the suit and before service of the writ the bank sold the twenty-five cars of oil and delivered the bills, and thereafter the suit proceeded as an action for damages for the conversion of the oil represented by the bills. The purchaser from plaintiffs had attached the new or substituted shipper's order bills of lading to sight drafts drawn on an Ohio company and deposited them with the defendant bank, which gave to said purchaser credit on its books for the net proceeds of the drafts, in an amount exceeding the amount of the check given by the purchaser to plaintiffs in payment for the oil, and the full amount stood unchanged to the credit of said purchaser when defendant bank received the check given by said purchaser to plaintiffs, but thereafter the bank applied said credit to the payment of the purchaser's unmatured note and to other checks drawn by him. *Held, first,* that the sale by plaintiffs was a cash sale, and the check to plaintiffs was given and accepted as a conditional payment; *second,* the title to the shipper's order bills of lading remained in the plaintiffs until said check was paid; and, *third,* the notations on the reverse side of the check of the car numbers, the car contents and the price of the oil purchased by said purchaser from plaintiffs, when said check was presented to the bank, and the invoices attached to the bills and the bills themselves, were notice to the defendant bank that the title to the bills was in plaintiffs, and as it converted them and the oil to its own use and refused to pay said check, it must

respond in damages for the value of the oil—the amount of the check plus interest.

2. ————: ————: Waiver: Pleading: Conclusion. An allegation in the answer of the defendant bank which had refused to pay a check drawn on it and given in payment for the sale of oil that "in any event plaintiffs waived their right to immediate payment therefor, if any such right existed," is not a plea of waiver, but is a mere conclusion of law, without the assertion of any issuable facts.

3. ————: ————: ————: Cash Sale: Presentation of Check. Where the defendant bank, upon which the purchaser of oil from plaintiffs had drawn his check in their favor, received the check within three days after it was drawn, and in the meantime had received and credited to the drawer his drafts for a larger amount drawn upon the consignee upon reconsignment of the goods sold and shipped, and there had been no change in the status of the drawer's account with the defendant bank, there was no waiver, for the small delay in presenting the check had nothing to do with the bank's failure to pay it.

4. ————: ————: ————: ————: Laches and Estoppel: Notice: No Altered Status. Where the check given to plaintiffs for the pur-chase of oil, drawn on the defendant Kansas City bank, was presented for collection, on the day it was drawn, to a local bank in Oklahoma, and the next day said local bank called the defendant bank by telephone and inquired if said check would be paid, and was told that it would not, and when the check arrived two days later defendant bank refused to pay it, and defendant bank credited to the drawer of the check the net proceeds of drafts for a larger amount drawn by him upon a consignee upon reconsignment of the oil, and applied the money so received on said drafts to the payment of said drawer's undue note, and was further notified by the agent of plaintiffs before it had so applied said proceeds that the check was given in payment of oil sold ·and delivered to the drawer by plaintiffs, and notice was likewise given by notations on the check itself, there having been no alteration in the status of the drawer's account with defendant bank, after it was credited with the drafts, until after its refusal to pay the check and until it applied the proceeds of the drafts on said undue note, the delay in presenting the check to defendant bank had nothing to do with its refusal to pay, and there was no waiver, or estoppel or laches on the part of plaintiffs, and the bank is liable to them for the amount of the check, with interest.

5. ————: Substituted Shipper's Orders: Title: Replevin and Conversion. The title to substituted shipper's order bills of lading which disclose on their face that they were issued in exchange for original

Lewis v. McMahon & Company.

bills of lading issued to the seller of the oil and, upon the receipt by the seller of the shipper's check in payment for the oil, delivered to such shipper, is in such seller, the sale being for cash; and such seller, upon the refusal of the bank, upon which the check is drawn, to pay it, is entitled to recover such substituted bills, and, as the bills are to be regarded as so much oil and symbols of ownership, he is entitled to recover the oil itself; and, if the bank, having refused to pay the check, after notice that the title is in the seller, converts such bills to its own use, the seller is entitled to recover damages for conversion of the oil represented by the bills.

6. ———: ———: ———: **Notice of Ownership.** The substituted bills of lading, covering twenty-five cars of oil, with drafts drawn by the shipper attached thereto, were delivered to the defendant bank, which placed to the credit of the shipper the proceeds of the drafts, which were payable on demand, as shown by the invoice of the oil in each car attached to the bills, and the deposit or credit of the drafts to the shipper's account remained unchanged until the bank received the check drawn on it by the shipper and given by him to the plaintiffs from whom he had bought the oil, receiving at the same time the original bills of lading and invoices. The local bank in which plaintiffs had deposited the check for collection on the next day by telephone asked defendant bank whether it would pay the check, and it refused. The check also bore on its reverse side notations showing that it was given for the purchase price of the oil, the number and initials of each car and the price of the oil therein being listed, and the invoices accompanied the bills. The vice-president of defendant bank testified that the agreement with the shipper was that the proceeds of his drafts were to be placed to his credit and used by him in paying for oil purchased. *Held*, that the bank had both actual and constructive notice, at the time it received the substituted bills of lading, that the title thereto was in plaintiffs, and was bound to know, as a matter of law, that when it refused to pay the check, the plaintiffs were entitled to recover the bills or their value.

7. ———: ———: ———: ———: **Innocent Purchaser.** A bank upon which a check is drawn, for the payment of oil purchased and shipped, is not an innocent purchaser, for value, of the bills of lading, from the drawer, if it has both actual and constructive notice, as in this case, that the title to such bills is not in such drawer, but in the payee of the check.

---

Citations to Headnotes: 1, Carriers, 10 C. J. 277; Sales, 35 Cyc. 326, 1238; 2, Pleading, 31 Cyc. 60; 3, Sales, 36 Cyc. 330; 4 to 7, Carriers, 10 C. J. 276, 289, 277, 272.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

REVERSED AND REMANDED (*with directions*).

*Edwards, Kramer & Edwards* and *G. C. Weatherby* for appellants; *Thos. Hackney* of counsel.

(1) The sale from plaintiffs to McMahon & Company was a cash sale. The check was given and accepted as conditional payment. There is nothing in the evidence justifying the contention that the sale by plaintiffs was not a cash sale. The worthless check was given at the time the bills of lading were delivered, and there is nothing in the evidence from which it could be inferred that the sale was on credit. (2) Delivery of the bills of lading was conditional upon payment of the check, and the check being dishonored the delivery was not absolute and the title to the oil and bills of lading was never vested in McMahon & Company, and plaintiffs, on dishonor of the check, could reclaim the property. Johnson-Brinkman Co. v. Central Bank, 116 Mo. 558; Strauss Pritz & Co. v. Hirsch & Co., 63 Mo. App. 95; Wright v. Miss. Valley Trust Co., 144 Mo. App. 640; Strother v. McMullen Lbr. Co., 200 Mo. 647; Ballard v. First Natl. Bank, 195 S. W. 559; Hall v. Railroad, 50 Mo. App. 177. (3) Delay in presenting the check was not a waiver of payment in cash for the oil, and the court erred in its conclusion of law that plaintiffs had waived payment in cash. (4) Plaintiffs had the same title to the substituted bills of lading which they had to the original bills. The original bills of lading were regarded as so much oil, being the symbols of the ownership of the same, and likewise the substituted bills of lading took the place of the originals and represented and were symbolic of the ownership of the same commodity. Friedlander v. Railroad Co., 130 U. S. 416. (5) The bank was not a purchaser for value of the bills of lading. Section 37, Federal Bills of Lading Act, 39 Statutes-at-Large, p. 544; Sec. 8604-s, U. S. Compiled Statutes,

1916; Thompson v. Sioux Falls Natl. Bank, 150 U. S. 231; Southern Trust Co. v. Vaughn, 277 Fed. 145; 1 Daniel Negotiable Inst. (4 Ed.) sec. 779-b; Randolph Commercial Paper, sec. 994; 6 Am. Law. Rep. 253-255; 2 Morse on Banks & Banking, sec. 603; Merchants Natl. Bank v. Marden Co., 234 Mass. 161; Natl. Bank of Commerce v. Armbruster, 42 Okla. 656.   (6) The bank had no lien on McMahon & Company's deposit, and therefore had no right to take of the proceeds of the drafts and apply $7500 thereof to the payment of the unmatured note.   Homer v. Bank of Commerce, 140 Mo. 225, 239; Zelle v. German Savings Inst., 4 Mo. App. 401; Corn Exchange Natl. Bank v. Locher, 151 Fed. 764; Columbia Natl. Bank v. German Natl. Bank, 56 Neb. 803; East River Bank v. Hoyt, 32 N. Y. 119, 39 Cyc. 959.   The only semblance of a lien the bank had was on the proceeds of the $10,000 loan.   This it released ratably as it paid the $5000 and the $2500 checks and foreclosed as to remaining $2500 applied on note. (7) McMahon's telegram to the bank on March 21st did not create any lien or equity in favor of the bank on the oil or bills of lading in controversy.   McMahon could create no trust, nor attach any legal or equitable right or claim to property which he did not then own, might never own, and which he did not even describe in his telegram. 9 Am. & Eng. Ency. Law (2 Ed.) 4; Porter v. Woods, 138 Mo. 539, 552.   The telegram had no effect to create a lien, or equity, in favor of the bank on any fund arising from future purchases of oil by McMahon.   Kansas City ex rel. Barrett Co. v. Spitcaufsky, 239 S. W. 812; Corn Exchange Natl. Bank v. Locher, 151 Fed. 766.   (8)   The bank's agreement to finance McMahon was terminated by the bank on account of McMahon's breaches of the agreement in issuing the two checks.   (9)   The court erred in holding that the bank was a purchaser in good faith. Johnson-Brinkman Co. v. Central Bank, 116 Mo. 573. (10)   The bank, pending the suit, having disposed of the property sought to be replevined, the case was then resolved into an action for damages to the same effect as though the action had been brought originally in con-

version. Sec. 2085, R. S. 1919; Dillard v. McClure, 64 Mo. App. 492.

*Bowersock & Fizzell* for respondent.

(1) The finding of facts is conclusive if supported by any evidence. Minor v. Burton, 228 Mo. 558; Nickey v. Leader, 235 Mo. 30. (2) The conclusions of law are correct. (a) The sale was not for cash. (b) If it was for cash, payment was waived. Smelting Co. v. Lead Works, 102 Mo. App. 158. (c) Appellants are estopped to claim a cash sale. Commercial National Bank v. Bank & Trust Co., 239 U. S. 520; Dymock v. Ry. Co., 54 Mo. App. 400; Smelting Co. v. Lead Works, 102 Mo. App. 158; Third National Bank v. Smith, 107 Mo. App. 178; Midland National Bank v. Mo. Pac. Ry. Co., 132 Mo. 492; Pollard v. Reardon, 65 Fed. 852; Munroe v. Philadelphia Warehouse Co., 75 Fed. 545; Commercial Bank v. Armsby Co., 120 Ga. 74. (d) The bills of lading are negotiable. Sec. 458, Compiled Laws of Oklahoma 1909; Hutchings v. Ry. Co., 84 Kan. 479; Roland M. Baker Co. v. Brown, 214 Mass. 196; Secs. 13527, 13550-1, 13553, 13554, 13560, R. S. 1919; U. S. Comp. Sts. 1916, secs. 8604 (b), (n), (nn), (oo), (p), (s). (e) The bank is a purchaser. Benton v. German American Bank, 122 Mo. 332; Hendley v. Globe Refining Co., 106 Mo. App. 20; Ayres v. Bank, 79 Mo. 421; Southern Land Co. v. People's Savings Bank, 101 Ark. 266. (f) The bank gave value. Pollard v. Reardon, 65 Fed. 848; R. S. 1919, secs. 812, 13575; Sec. 4460, Comp. Laws Oklahoma 1909; 8 U. S. Comp. St. 1916, secs. 8604 (aaa), 8604 (w); Re United States Hair Co., 239 Fed. 703.

RAILEY, C.—This is an action in replevin, tried by the Circuit Court of Jackson County, Missouri, without a jury, on a third amended petition, in which appellants sought to recover twenty-five separate shipper's order bills of lading, representing twenty-five separate tank cars of fuel oil, shipped in interstate commerce from Coffeyville, Kansas, to Findlay, Ohio. It is alleged in the above

petition, and admitted in the answer of the defendant bank, that plaintiffs were and are a copartnership, doing business under the firm name and style of F. J. Lewis Petroleum Company, with their chief office in the city of Chicago and State of Illinois; that defendant James McMahon & Company is a corporation, organized under the law, with its chief place of business in the city of Tulsa and State of Oklahoma; that defendant Fidelity National Bank & Trust Company of Kansas City, formerly Fidelity Trust Company, is a corporation organized according to law and doing business as a banking and trust corporation, with its chief office and place of business in Kansas City, Jackson County, Missouri.

The bills of lading were duly indorsed by the shipper, the Kansas Oil & Refining Company, and, together with invoices for each of said cars, were sold to the plaintiffs at Tulsa, Oklahoma. After this purchase by the plaintiffs, on March 28, 1918, they sold to defendant, James McMahon & Company, at an agreed price, aggregating for the twenty-five cars of oil, $11,189.47, for which McMahon & Company gave to plaintiffs their check drawn on the respondent Fidelity National Bank & Trust Company of Kansas City, Missouri, then the Fidelity Trust Company of said city. The bills of lading with a separate invoice for each car, were delivered by plaintiff's to McMahon & Company contemporaneously with the giving of said check.

On delivery of the twenty-five bills of lading, McMahon & Company surrendered them to the issuing carrier, and took out interstate shipper's order bills of lading for the twenty-five cars, reconsigning them to Cleveland, Ohio. The new or substitute bills of lading disclosed that they had been issued in exchange for the prior bills of lading.

The above check given plaintiffs by McMahon & Company, was deposited for collection in the bank of Tulsa, Oklahoma, and was forwarded through the mails to defendant bank for payment. On receipt of the check the defendant bank refused to pay it, and thereupon it

was protested. The bills of lading had in the meantime been placed by McMahon & Company in the hands of defendant bank and, on the refusal of the latter to pay the check, the plaintiffs demanded from said bank and McMahon & Company the bills of lading aforesaid, which they refused to deliver to plaintiffs and, hence, the institution of this suit followed.

After the commencement of the suit, and before the writ of replevin was served, the bank sold the twenty-five cars of oil at Kansas City, Missouri, and delivered to the purchaser the bills of lading therefor, sought to be recovered by plaintiffs, and this case thereupon proceeded as an action for damages, for the conversion of the oil represented by the bills of lading.

The bank, in its answer, claimed to be an innocent purchaser, for value, of the bills of lading in question, and that by reason thereof it was entitled to their possession as against the plaintiffs. The answer also alleged that the sale by plaintiffs to McMahon & Company was not a cash sale, and that the title to said oil passed to McMahon & Company on delivery of the bills of lading to them; and that plaintiffs waived their right to immediate cash payment. It likewise charges that plaintiffs were guilty of laches, and were estopped from claiming the bills of lading in the hands of the bank.

Plaintiffs' reply consisted of specific denials of the new matter pleaded in said answer.

At the conclusion of the evidence, both sides asked for specific findings of fact, separate from the court's conclusion of law. The court refused plaintiffs' requested findings, and gave those requested by the bank.

There is but little, if any, controversy over the material facts of the case. After carefully reading the evidence, we have reached the conclusion that the statement of facts made by appellants is substantially correct and we hereby adopt the same as our statement, as follows:

The plaintiffs were the unquestioned owners of the twenty-five cars of oil and the twenty-five bills of lading issued therefor on March 28, 1918, when they sold the oil

and bills of lading to McMahon & Company for $11,189.47, and as a part of the same transaction, and in payment therefor, McMahon & Company gave plaintiffs their check for that amount, drawn on defendant bank. The check was in the form of a voucher check, showing that it was given for the purchaser price of the twenty-five cars of oil, the numbers and initials of these cars and the price of each car being listed on the check.

On obtaining the bills of lading McMahon & Company took out exchange shipper's order bills of lading therefor and delivered these bills of lading with the identical invoices received from plaintiffs to defendant bank on March 29, 1918. These bills of lading were attached to sight drafts drawn on Fred G. Clark & Company, Cleveland, Ohio, for $11,810.15. This latter amount, less twenty cents per one hundred dollars as exchange, was at once credited by the defendant bank to the checking account of McMahon & Company in that bank.

The bills of lading, drafts, etc., were sent by messenger of McMahon & Company to the bank, and the bank officers had no talk or discussion with McMahon & Company regarding their handling or disposition of the proceeds.

On April 1, 1918, the Central National Bank at Tulsa, Oklahoma, then having in its custody the check given plaintiffs as above mentioned, called the defendant bank over long-distance telephone and asked if this check would be paid and was told that it would not. The Tulsa bank then forwarded the check direct to the defendant bank by the United States mail. The check came to the defendant bank on the morning of April 3rd, at which time there stood to the credit of McMahon & Company in their checking account the full amount of the deposit of the drafts on March 29th. The check, as before stated, contained an invoice of the twenty-five cars of oil, giving the car initials, numbers and the price of each car and was of itself notice to the defendant bank that it was for the purchase price of the oil in question.

In addition to this statement on the check, plaintiffs' representative, Mr. Loehle, called at the defendant bank on the morning of April 3rd and discussed the matter of the check with the bank officials and was informed that the check would not be paid. Mr. Loehle thereupon gave written instructions to the bank to protest the check. In the afternoon of April 3rd and after refusing to pay the check, and after learning, both by the memoranda on the check as well as by the conversation with Mr. Loehle, that it was for the purchase of the oil in question, the bank charged off of McMahon & Company's account $7500 and applied the same to McMahon & Company's note held by the bank, but not then due. This note bore date March 16, 1918, was for $10,000, due sixty days after date. In addition to the company's name signed to the note as maker, it was indorsed by James D. McMahon and F. B. Bordenkinter.

The testimony showed that this note had been given under an arrangement made by the bank a few days previous to its date, by which McMahon arranged with the bank to give his company a line of credit in the purchase of oil. The bank agreed to handle McMahon & Company's drafts as cash on receipt of drafts and bills of lading, and it was further agreed that McMahon & Company should keep the proceeds of the $10,000 note in their checking account in the bank. When the note was executed the bank placed the full amount of the face of the note to McMahon & Company's credit in its regular checking account. McMahon & Company made no other deposits in defendant bank save and alone that of the bills of lading and drafts above mentioned on March 29th.

On March 19, 1918, McMahon & Company gave a check on defendant bank to the Citizens State Bank of Tulsa, Oklahoma, for $5000. When this check was presented to defendant bank on March 20th, it was paid out of McMahon & Company's deposit. Mr. Tremble, vice-president of the defendant bank, testified that he knew of this check and consented to its payment. After paying this $5000 check, the bank wrote McMahon & Com-

pany calling their attention to the matter of their agreement not to check against this money on deposit. James McMahon, on March, 21, 1918, wired the bank that papers were in the mail that day covering twenty-five cars of oil with drafts and bills of lading attached, which should bring his balance up to about $14,000.

These promised bills of lading and drafts were never sent by McMahon & Company to the bank. However, on March 22nd, McMahon & Company drew another check on defendant bank for $2500, which the payee presented and had certified by defendant bank on March 23, 1918. On certifying the check the bank charged it to McMahon & Company's account.

The drafts and bills of lading promised in McMahon's telegram of March 21st, not having been received, the bank on March 26th charged off the remaining $2500 standing to their credit in the checking account of McMahon & Company and applied it on the $10,000 note. This closed the account on the bank's books with McMahon & Company, leaving only the unmatured note for a balance of $7500. There were no further communications between the bank and McMahon. So that, from the 26th day of March until the 29th day of March, 1918, there was no amount standing to the credit of McMahon & Company in the defendant bank, nor any charge against McMahon & Company in the checking account.

On receipt by the bank of the drafts and bills of lading in question on March 29th, from a messenger with whom the bank officers had no talk, according to their testimony, the bank placed the full amount of the drafts, less exchange, to McMahon & Company's credit in its checking account. This account stood untouched in any wise from that day until the morning of the 3rd of April when the check given plaintiffs was presented and payment refused. It was not until shortly after noon of April 3rd that the bank undertook to charge off against McMahon & Company's account the $7500 which it applied on the note. Later on that day, April 3rd, the bank paid another check of McMahon & Company for $415.60.

After charging McMahon & Company's account with the $7500 payment on the note, the bank charged the account with the further sum of $35.55, as interest on the note for the time it had run.

It was admitted by the bank officers that there was no special agreement made between the bank and McMahon & Company with respect to the disposition of the credit of the drafts when the drafts and bills of lading were received on March 29th. Accordingly, the full amount of the face of the drafts, less exchange, was credited to McMahon & Company's checking account. Under their previous arrangement of March 15th, all moneys from drafts deposited by McMahon & Company should go to their credit and they could check on this account to buy oil.

The court, in the findings of facts requested by defendant bank, found that the $5000 check paid by the bank March 20, 1918, was paid "under protest," the finding further reciting "defendant receiving McMahon & Company's assurance that bills of lading were in the mail to cover the check." There is not a word of testimony to support this finding. On the contrary, the bank officers admitted that after consideration of the matter, when the $5000 check was presented, they decided to pay and did pay the same. After making this payment they wrote the letter to McMahon & Company. It was not until March 21st that McMahon wired the bank that drafts and bills of lading were in that day's mail sufficient to more than cover this check; but the check had been paid in full without protest the day previous and charged to McMahon & Company's account. Likewise, when the $2500 check was presented on March 23rd, the bank, without any protest, promptly certified the check and delivered it to the holder, charging the same to McMahon & Company's account, without any further communication with McMahon and without any specific agreement. No bills of lading and drafts having arrived, the bank, on March 26th, closed the McMahon & Company checking account

by charging off the remaining $2500 standing to their credit and applied it to the $10,000 note.

As previously stated, McMahon & Company bought the oil from plaintiffs on March 28th, giving their check, later dishonored, deposited the substitute bills of lading and drafts on March 29th, in defendant bank, and received credit for the full amount thereof. This amount stood to McMahon & Company's credit in open checking account in the defendant bank until after the presentation and dishonor of the check given plaintiffs by McMahon & Company and after the bank officers had talked with plaintiff's representative, Mr. Loehle, regarding plaintiffs' check. After the dishonor of the check, and after the bank had received notice by the writing on the check, as well as by the conversation with Mr. Loehle, that the check was given for the purchase price of the very oil in question, the bank undertook to strengthen its hold on the bills of lading by charging McMahon & Company's account with $7500 and applying the same to their unmatured note and also charged McMahon & Company's account with $35.55 as interest on the note.

The trial resulted in a finding and judgment in favor of defendants. In due time plaintiffs filed their motion for a new trial, which was overruled, and the cause duly appealed by them to this court.

The law questions involved, and such other matters as may be deemed of importance, will be considered in the opinion.

I. Appellants contend that: "The sale from plaintiffs to McMahon & Company was a cash sale. The check was given and accepted as conditional payment. The court erred in holding that the sale was not a cash sale."

The evidence is undisputed that on March 28, 1918, the plaintiffs delivered the bills of lading to McMahon &

**Bills of Lading: Title.** Company and simultaneously received the check of said purchaser for $11,189.47 payable to the order of F. J. Lewis Petroleum Company, drawn on defendant bank; and on the reverse

side of said check, appears the car number, contents and price of the oil so purchased by McMahon from plaintiffs. There is no allegation in either of the pleadings to the effect that said check was accepted as full payment for the bills of lading etc., delivered. Nor is there a syllable of evidence tending to show that said check was accepted as payment for said oil and bills of lading. Payment of the check having been refused, by the defendant bank, the title to the oil and bills of lading, as between plaintiffs and McMahon & Company, remained in the plaintiffs. [Southwestern F. & C. P. Co. v. Stanard, 44 Mo. l. c. 84-5; Johnson-Brinkman Co. v. Central Bank, 116 Mo. l. c. 569-570; Strother v. McMullen Lumber Co., 200 Mo. 647; Coffman v. Fleming, 301 Mo. 313, 256 S. W. 731; Selby v. McCullough, 26 Mo. App. 66; Hall & Robinson v. Mo. P. Ry. Co., 50 Mo. App. 179; Carroll Ex. Bank v. First Nat. Bank of Carrollton, 58 Mo. App. 17; Barton Bros. v. Hunter, 59 Mo. App. 610; Strauss, Pritz & Co. v. Hirsch & Co., 63 Mo. App. l. c. 103-4-5; Biscuit Co. v. Grocer Co., 143 Mo. App. l. c. 306-7; Wright v. Trust Co., 144 Mo. App. 640; Ballard v. First Natl. Bank of Bolivar, 195 S. W. (Mo.) 559; Crocker State Bank v. White, 226 S. W. (Mo. App.) 972-3; Bank v. Railroad, 46 N. W. (Minn.) 342; Woodburn v. Woodburn, 115 Ill. 427; Hodgson v. Barrett, 33 Ohio St. 63; People's State Bank v. Brown, 80 Kan. 520; Gose v. Brooks, 229 S. W. l. c. 981.]

The trial court in its conclusion of law, under proposition one, recites that: "The court finds that the sale of the oil, represented by the bills of lading in question herein, from the plaintiffs to James McMahon & Company, was not a sale for cash and that therefore the title to said oil passed to said McMahon & Company."

The finding of the court in the above proposition is without any *substantial* evidence to support it, and, on the *undisputed* facts in the case, is directly in conflict with the authorities heretofore cited. The above finding as to both the facts and the law is erroneous and overruled.

II. Appellants complain of the trial court's finding of law, under proposition 2, as follows: "The court finds that plaintiffs by delaying five days before presenting for payment to the defendant bank the check given by James McMahon & Company in payment for said oil, waived payment in cash for said oil and that the title thereto passed to said MaMahon & Company."

*Cash Sale: Waiver: Estoppel.*

The answer of the bank contains no *issuable* plea of *waiver*. It simply alleges "that in any event plaintiffs waived their right to immediate payment therefor, if any such right existed."

In State ex rel. Home Savings Ins. v. Lee, 288 Mo. 1. c. 698, our Court in Banc, in discussing a similar question, said: "The pleader fails to allege wherein the articles of association fail to comply with the various sections indicated, or that such compliance is required. The allegation is simply the averment of a legal conclusion; not the statement of issuable facts, and is to be treated as no statement at all. [Mallinckrodt Chemical Works v. Nemnich, 169 Mo. 388; Lappin v. Nichols, 263 Mo. 1. c. 291.]" To the same effect are the following cases; Musser v. Musser, 281 Mo. 1. c. 660-1 and cases cited; Keppler v. Wells, 238 S. W. (Mo.) 1. c. 429; State ex rel. v. Brewing Co., 270 Mo. 1. c. 108; Maniaci v. Express Co., 266 Mo. 1. c. 642; State ex rel. v. Railroad, 240 Mo. 1. c. 50; Gibson v. Railroad, 225 Mo. 1. c. 482-3; Sidway v. M. L. & L. S. Co., 163 Mo. 1. c. 373-4-5.

Aside from the foregoing, there are no facts in this case which warranted the court in finding that plaintiffs waived payment in cash for said oil and that the title thereto passed to said McMahon & Company. The testimony is undisputed, that the check was given to plaintiffs by McMahon & Company at Tulsa, Oklahoma, on March 28, 1918. On March 29, 1918, the defendant bank credited the account of James McMahon & Company with $11,786.53. As found by the trial court, and shown by the evidence, "on April 1 the Central National Bank at Tulsa called the defendant Fidelity National Bank &

Trust Company over the long-distance telephone and asked if McMahon & Company's check for $11,189.47 would be paid and was told that it would not be paid. On April 3 the check was presented and payment was refused by the defendant bank." There was nothing on deposit in defendant bank to the credit of McMahon out of which the check could have been paid until the deposit was made by said bank on March 29, 1918, as aforesaid. We then find from the undisputed facts, that the defendant bank, within three days from the time plaintiffs received their check refused to pay the same. April 2d was Sunday and plaintiffs' check, though forwarded by mail on April 1, 1918, did not reach defendant's bank until the morning of April 3, 1918. There was no change in the status of the McMahon account in defendant bank from March 29, to April 3d, when the check given plaintiffs was presented and payment refused. During all that time, the McMahon & Company checking account with the defendant bank showed a credit for the full proceeds of the drafts deposited by McMahon & Company on March 29, 1918. Not a dollar had been paid out up to April 3, 1918, nor any charge made in the meantime. The defendant bank had not altered its position. The record is devoid of any substantial evidence tending to show that the delay in presenting the check had anything to do with defendant's conduct in refusing to pay the same, and, especially, after stating over the telephone on April 1, 1918, that it would not pay the check. The alleged defenses of waiver, laches and estoppel, are absolutely without merit and have no place in the case, even if the answer had tendered an issue on these questions as required by the authorities heretofore cited.

We accordingly hold, that the court's findings of law, as set out in its propositions two and three, relating to waiver, laches and estoppel are unsupported by substantial evidence, constitute no defense in this case and are hereby overruled.

III. Appellants challenge the correctness of the court's finding of law numbered 6, which reads as follows: "The court finds that the plaintiffs had and have no title to or right to possession of the bills of lading issued to James McMahon & Company, indorsed in blank and delivered to the defendant Fidelity National Bank & Trust Company."

*Title.*

We have heretofore found from the undisputed facts, in view of the established principles of law declared in the authorities cited under paragraph one of this opinion, that the sale of the oil in controversy, by plaintiffs to James McMahon & Company, was a cash sale, and that on the refusal of the bank to pay plaintiffs' check they were entitled to recover from McMahon & Company the twenty-five bills of lading representing the oil which plaintiffs had sold said purchaser. They had the same right to recover the substituted bills of lading issued to McMahon & Company after they obtained the original bills of lading from plaintiffs. These substituted bills of lading disclosed on their face that they were issued in exchange for the original bills of lading delivered by plaintiffs to McMahon & Company. This was admitted by the officers of defendant bank who handled them. The original bills of lading were regarded as so much oil, and were the symbols of ownership of same. The substituted bills of lading took the place of the originals, and were likewise symbolic of the ownership of said oil.

In Friedlander v. T. & P. Railroad Co., 130 U. S. 1. c. 424, the Supreme Court of the United States, in discussing the character of bills of lading, and how they differed from promissory notes, said: "But bills of lading answer a different purpose and perform different functions. They are regarded as so much cotton, grain, iron or other articles of merchandise, in that they are symbols of ownership of the goods they cover."

The defendant bank recognized the above as a correct statement of the law, for Mr. Geo. T. Tremble, the vice-president of defendant bank, testified that the sub-

stitute bills of lading with the invoice showing they represented oil, were sent with the drafts to the First National Bank at Cleveland, Ohio, for collection, just as they were received by the defendant bank from McMahon & Company. The drafts were not paid, and these documents were returned to the defendant bank. Tremble testified as follows:

"Q. (By THE COURT): You took possession of the oil and sold it, or you sold the bills of lading? A. Really I suppose we sold the oil represented by the bills of lading. . . .

"Q. Getting away from the legal effect, Mr. Tremble, what you really did was to turn over the bills of lading? A. That is all we did; we surrendered the bills of lading.

"Q. You never had the oil? A. No, sir.

"Q. Except as represented by the bills of lading? A. That is all."

The answer of defendant bank admits that the substituted bills of lading covered the oil in controversy. The finding of the court on proposition six, supra, is in conflict with the undisputed facts, as well as the law of the case, and is accordingly overruled.

IV. Proposition 7 of the court's finding of law is as follows: "The court finds that the defendant Fidelity National Bank & Trust Company had at the time of receiving said bills of lading from James McMahon & Company no knowledge or notice of any infirmity in the title of said McMahon & Company, and that it at that time and without notice paid value therefor to said McMahon & Company."

Notice.

We are of the opinion that the above finding of law is without evidence to support it, and is in direct contravention of the authorities cited in Paragraph I of this opinion.

George T. Tremble, vice-president of defendant bank, testified on behalf of the bank, as follows:

"Q. State what your agreement with him (Mc-Mahon) was? A. We agreed to finance Mr. McMahon in the purchase of quite a quantity of oil, about 2,000 cars, as I remember. This oil was to be purchased over a period of about a year. He stated that he had made a contract to deliver this oil to Fred G. Clark & Company of Cleveland. It was to be shipped at the rate of around twenty-five car-loads a week. We agreed to furnish him the money for twenty-five car-loads at a time. That is, we were to advance the money on drafts which he was to draw on Fred G. Clark & Company, and to each of these drafts was to be a bill of lading attached, a negotiable bill of lading covering the shipment of the car. . . . I told him in order to make the deal justifiable on the part of the bank he would have to have a regular account, and in order to create a balance we loaned him $10,000, which was immediately deposited to his credit. The provision was that this $10,000 was not to be used at all.

"Q. Was there anything in the arrangement about his use of the money from the discounting of the drafts on Clark? A. That was to go to his credit; then he had the right to use that for to buy more oil.

"Q. At once? A. At once.

"Q. That is, if I understand you, the Clark drafts were to be deposited to his credit and he was to have the right to use them before the returns came in to you? A. Yes, as the drafts on Clark came in we immediately credited them to his account, increasing his balance to that much.

"Q. And then he could check out *without waiting on your returns?* A. At once."

Pursuant to this agreement, McMahon sent the substituted bills of lading covering the twenty-five cars of oil, with drafts attached thereto, to defendant bank, and the latter, on March 29, 1918, placed to the credit of James McMahon & Company, on the books of said bank as a checking account, $11,786.53. These twenty-five drafts were all drawn by McMahon & Company, on Fred

G. Clark of Cleveland, Ohio, payable on demand for oil, as shown by the invoice of each car. The above deposit to the checking account of McMahon & Company remained on the books of the bank, without any charge or change until April 3, 1918, when plaintiffs' draft was presented and payment refused. Furthermore, the bank at Tulsa, on April 1, 1918, had called up defendant bank by long distance telephone and asked whether the bank would pay plaintiffs' check, and it refused to do so. We have no hesitation in holding that the bank had both actual and constructive notice of the fact, on April 3, 1918, that plaintiffs' check was given for the twenty-five cars of oil, represented by the substituted bills of lading then in possession of the bank, and that too, before any change had been made as to the checking account of McMahon & Company on the books of said bank for the above sum of $11,786.53. The bank was, therefore, bound to know, as a matter of law, that when it repudiated, and refused to pay the check of plaintiffs, the latter had the legal right to recover the substituted bills of lading or their value from the bank under the numerous authorities cited under Paragraph I. of this opinion. We accordingly rule that the court's finding of law numbered 7 is unsupported by either the law or evidence in the case, in respect to above matter.

V. The finding of law numbered 5 made by the court, reads as follows: "The court finds that the defendant Fidelity National Bank & Trust Company is a purchaser in good faith of the bills of lading in question and of the oil represented thereby, and that therefore plaintiffs cannot recover the bills of lading or the oil from said defendant."

Innocent Purchaser.

This finding ignores the question of notice which the bank had, as to the infirmity of McMahon's title heretofore discussed, and found against the bank. It ignores the question, as to whether the bank was an innocent purchaser for value of said bills of lading, as contemplated in the Federal law relating to transactions of this

character involving interstate commerce.   [Thompson
v. Sioux Falls Natl. Bank, 150 U. S. 231; Southern Trust
Company v. Vaughn, 277 Fed. 1. c. 149.]   In considering
this finding by the court, we deem it proper to go back to
the original dealings between McMahon and the defend-
ant bank as they occurred on March 16, 1918.

As heretofore stated, the officers of the bank or
trust company knew that McMahon was expecting to deal
in the sale of oil and, on the last named date, took his
note for $10,000, due sixty days after March 16, 1918,
payable to the order of the Fidelity Trust Company,
with interest from date at the rate of eight per cent per
annum, etc.   This note was deposited with the defend-
ant bank, and the latter credited James McMahon &
Company on its books, with the sum of $10,000, but no
money was paid out on said transaction at that time.
George T. Tremble testified, in reference to this $10,000
transaction, as follows:

"Q.   It was placed, however, subject to check
against it, of McMahon & Company?   A.   Yes, sir.

"Q.   And their signature left with you same as
usual?   A.   Yes, sir."

He further testified that the agreement with Mc-
Mahon & Company, was a verbal one, and that no part
of the $10,000 was to be checked out.

On March 20, 1918, Vice-President Tremble wrote
McMahon & Company, as follows:

"The check on your account came in to-day for
$5000, which I O. K'd, notwithstanding the fact that my
understanding was that this particular $10,000 which
you had on deposit would not be checked against.

"My understanding was that you would deposit the
drafts with bills of lading attached *and would check
against them,* and that the $10,000 now here was to re-
main as a steady balance.

"Under present conditions, we would hardly be in-
terested in making an *unsecured* loan of $10,000 and *hav-
ing the proceeds* withdrawn merely for the sake of the
interest we are getting on the loan."

If we understand this $10,000 deal, it simply provided that McMahon & Company should have an ostensible credit of $10,000 as a checking account on the books of the bank, with the verbal agreement that no part of same should be checked out. Was this fictitious deal entered into for the purpose of allowing McMahon & Company to deceive the business public with whom they were dealing, by having it understood that they had a checking account with the defendant bank for $10,000, when as a matter of fact they did not have a dollar on deposit until March 29, 1918, when the bank placed to their credit $11,786.53, growing out of the deal in controversy here? If not what was the real purpose of the transaction? Our Court in Banc in the recent case of Bank of Slater v. Union Station Bank, 283 Mo. l. c. 318-19, 222 S. W. 993, has, in legal effect, designated contracts of the above character as a fraud upon the public and contrary to public policy. Notwithstanding the letter from Tremble to McMahon & Company, above quoted, complaining of the $5000 check drawn against this sacred $10,000 paper credit, we find that, on March 23, 1918, the bank paid a second check of McMahon & Company for $2500, out of this same sacred fund. McMahon & Company had no money on deposit in the bank when these two checks for $5000 and $2500 were paid by the bank, nor did they have any money on deposit until the $11,786.53 was placed to their credit by the bank on March 29, 1918, as a part of the proceeds of the oil in controversy.

It is pertinent to inquire, *why* the plaintiffs' check for $11,189.47 was not paid by the bank out of the proceeds of the oil transaction deposited to the credit of McMahon & Company on March 29, 1918, amounting to $11,786.53? The above deposit was not only *sufficient* to take care of plaintiffs' check, but likewise of the $415.60 check paid by the bank on April 3, 1918. Why was this $415.60 check any more entitled to be paid out of said checking account than plaintiffs' check?

Summing up the whole situation, we think it is manifest, upon the face of the record, that McMahon & Com-

pany, in violation of their unlawful agreement made with defendant bank on March 16, 1918, received from said bank these two items of $5000 and $2500 for which the bank had no substantial security. When the proceeds of the oil transaction came in on March 29, 1918, the bank placed the sum of $11,786.53 on account of same to the credit of McMahon & Company and, while matters were standing in this shape, the Tulsa bank called up defendant bank on April 1, 1918, to know whether plaintiffs' check would be paid, and was informed to the contrary. Thereupon, on April 3, 1918, when plaintiffs' check had arrived, the defendant bank conceived the idea of using the money on deposit to the checking credit of McMahon & Company by applying the same to the extinguishment of the $5000 and $2500 indebtedness which McMahon & Company owed the bank on account of the unlawful agreement aforesaid; and by wiping out the remaining credit of $2500 on the books of the bank as a part of said unlawful agreement. The bank then had notice that the bills of lading were liable for the payment of plaintiffs' check if payment of the latter was refused.

VI.   In conclusion we hold that the deal between plaintiffs and McMahon & Company, was a cash transaction; that plaintiffs' check was presented to

Conclusions.      the bank in sufficient time, and was entitled to be paid out of the proceeds of the oil transaction credited to McMahon & Company on the books of said bank; that payment of plaintiffs' check having been wrongfully refused by the bank, the appellants herein were entitled to recover the substituted bills of lading aforesaid or, in lieu of same, to hold the defendant bank for the value thereof at the time of the conversion of same, with lawful interest thereon. We further find that the bank had notice of plaintiffs' legal rights before it attempted to convert said bills of lading to its own use. We likewise find that the bank was not an innocent purchaser, for value and in good faith, of the bills of lading aforesaid.

·We accordingly find the issues herein in behalf of appellants; and hereby reverse and remand the cause, with directions to the lower court to set aside the former judgment herein, and to enter a judgment in behalf of these appellants against the defendant bank in conformity to the views herein expressed. *Higbee, C.,* concurs.

PER CURIAM:—The foregoing opinion of RAILEY, C., is adopted as the opinion of the court. All of the judges concur, except *Walker, P. J.,* not sitting.